You may proceed. May it please the court. Good afternoon. My name is Isaac Swalwell. I represent the petitioner, Mr. Ricky Guidry, in this appeal of an agency decision. The first issue presented today is whether or not the agency erred when they held that the respondents had met their burden in rebutting the 920A presumption in favor of the plaintiff. Importantly, the OALJ in this hearing found that the petitioner had made a credible and sufficient showing, sufficient to invoke the presumption of causation and to establish that an injury had occurred. The evidence supporting that finding included not only the petitioner's testimony, but also the testimony of Dr. Bruce Bonker, who was a doctor that the respondent, the employer, had hired to examine the claimant after he was injured, as well as the claimant's treating physician, Dr. Muldowney, an orthopedic surgeon. Dr. Bonker reported the injury was work-related. Dr. Muldowney reported that the gentleman was diagnosed with lumbar and cervical disc degeneration and spinal stenosis after the accident. Dr. Neil Romero, the employer's second medical opinion physician, also testified that the petitioner could have suffered an exacerbation or aggravation of an underlying condition. Once this presumption was made, the burden shifted to the respondent to rebut the presumption by showing, by a preponderance of evidence, that the accident or injury did not happen, that there is no causal link. The OALJ analysis of the 920A presumption or rebuttal evidence, excuse me, was brief, listing only a solitary radiologist's opinion. That radiologist, Dr. Kagan, had been hired by the employer to compare pre-existing or underlying conditions. The radiologist did not examine the patient. The radiologist did not review other history. The radiologist essentially reviewed the film and rendered a report. Isn't that, Mr. Swallow, isn't that the key issue at Step 2, which is, does this represent the aggravation of a pre-existing injury or simply the continuation of a pre-existing injury? I don't think that that's the key issue just on the basis of the MRIs. I mean, the key and end issue is whether or not it was an aggravation or a new injury. Yeah, that's what I meant. Okay. Excuse me. So, yes, that is an issue. That is the issue that all of the different issues we've talked about or will talk about all lead to that. We all agree that there was a prima facie case, at least I think we do. Okay. The prima facie case is in the question as well, is there a rebuttal, and the AALJ relied on Dr. Kagan. Now, why can't the AALJ do that? Well, I think the AALJ can't rely solely on Dr. Kagan for several reasons. One, because in the case of Dr. Kagan, he was a non-examining physician, all right? The Longshore jurisprudence has said repeatedly that someone who is a non-examining physician does not have the same weight as other physicians who've actually examined the individual, who've actually correlated findings from an MRI or from x-rays to physical examination and also subject to the... Did the AALJ express reasons for not deeming the other doctors credible? Well, he basically, in our understanding of his decision, he basically said that because they basically believed the subjective complaints of the claimant and he was not credible, that their entire reports were no longer credible. But again, I would submit to you that that's an irrational finding because what it does is essentially say that these trained physicians, two of whom, two of the three we're talking about, had been hired by respondent by the employer or essentially duped by this claimant and that everything he said, they only relied on that. However, Dr. Bonker, the initial physician who saw him, filled out several Florida worker comp forms where he said that he basically correlated physical findings, objective physical findings on examination with MRI and also subjective complaints. And as a result of that, he believed and did not believe that there was any malingering going on or any type of subterfuge by the claimant, that he, Mr. Guidry, had suffered an accident and as a result of that accident, had an injury. So how many doctors are we talking about that factor into the mix here? Are there four? Four doctors. So am I right? Did the ALJ say, well, did Kagan and Romero both say, no, look, this is not an aggravation, this is a continuation of ongoing symptoms? Kagan did. And Kagan is a non-treating. I understand that, but... Romero did, but Romero also, he is equivocal, his opinion is equivocal for the simple fact that he also says that it's ongoing, but that he's not at MMI yet and that he can't go back to what he was doing, he would need to get physical therapy. So my only point here, it's certainly not to argue about doctors' opinions because I'm not a doctor, it's to say, what can the ALJ rely on to find, what does it need to find substantial evidence? Yes. Okay, so what, can the ALJ rely on these doctors' opinions and prefer them to other doctors' opinions and say, well, look, I'm going to rely on this evidence and not this evidence? I think that what he has to do is he has to look at all of the doctors and under the totality of the evidence standard, he has to basically then say, the doctors that are treating physicians, I'm going to give them greater weight. If he does that, I don't think Kagan's report has any weight compared to the other three. Do you have a case that says an ALJ has to give greater weight to a treating physician over a, I guess you call it a reviewing physician? I do, I can't cite it for you as we stand here, but I'm sure we put it in our brief. I can submit it to you. No, if it's in your brief, it'll be there. Thank you. I also would point out to you, Judge Duncan, that the Fifth Circuit in 2017 in the Nehling case, in review of a Social Security decision, said basically that reports of physicians who don't examine a claimant, take it alone, would not be substantial evidence on which to base an administrative decision. And that was a Social Security decision, but it's also covered by the APA, which would be similar to the Longshore. But wouldn't that change after the fact? Didn't Social Security change its rules so Nehling is no longer good law? So Social Security may have changed, but not Longshore. Am I right, though, that that's the one where we said non-treaters don't get the same deference, but then they went and changed so they made sure that non-treaters get the same deference? Yes, okay. That's Social Security, not Longshore, and that rule still applies in this context. I would think it does, yes ma'am. So in addition— What would we have to believe, what would, legally, what would we have to say here to rule for you? Well, I think that what you have to believe is that the judge misapplied the facts of the case in making his credibility determination. And that even if you take Ricky Guidry out of the mix, the judge, I don't think, is entitled to say, because Ricky Guidry isn't credible, all of these doctors who have their own independent standards and who use their own independent judgment to arrive at their decisions are also no longer, their opinions aren't valid. Because if that were the case, then why isn't Judge Romero, who also talked to Mr. Guidry, not also basically disregarding it as not being credible? And Judge Romero also, I'm sorry, and Dr. Romero also basically disagreed with some of what Dr. Kagan said. Dr. Kagan said that he believed that the disks had gotten better after this accident. But Dr. Romero, in testimony, said, no, that doesn't happen. You know, when you look- But why is this not just that we would weigh it differently if it were before us, but it's not our prerogative just to weigh it differently? I don't think you weigh it differently. I think if it was weighed the way it was supposed to be weighed, then- What's the legal error? What's the legal error in that? The legal, okay. I think the legal error here is that the judge basically said, when he found Mr. Guidry not credible, he cited several different things. When he cited those things, I think we have shown in our brief that they are not correct, okay? So, for instance, the judge said that Mr. Guidry had drug-seeking behavior based in part on prescriptions given to him for pain by the VA, okay? But nowhere in the record does it say that any of those prescriptions by the VA were not consistent with the standard of care for the specific reasons they were issued. In addition to that, the only time drug-seeking behavior is actually in his record is from immediately after the work accident by a Dr. Diallo at the Tampa, Florida, VA facility. Yet he wasn't the treating physician. The actual treating physician, Dr. Potter, who was actively treating Mr. Guidry, disagreed with Dr. Diallo, apparently, because he prescribed Percocet the same day, after he had seen by Dr. Diallo. In addition to that, if Mr. Guidry is having drug-seeking behavior on which to say he's no longer credible, then he also underwent a drug screen for this employer before he began to work, and during the several years previous to this work, he had undergone two additional pre-employment physicals and drug screens, and he had passed all of them. And on the January 18, 2015, which is approximately two and a half months before this accident, or two months before, before beginning to work for this employer, he was tested for opiates and oxycodone, and he was negative for it. So you have all of those, and then in addition to that, I believe that the judge's opinion is partially, even though the BRB said, no, we don't think he relied on it, but he mentioned it, the evidence that was withdrawn from the exhibits, the evidence about Ricky Guidry being arrested for possession of cocaine, that evidence concerned a different Ricky Guidry, and responded, withdrew it at trial, yet in the decision, the judge marked it as marginally relevant. But again, that still shows that he looked at it as being somewhat relevant. All of these things taken into context doesn't necessarily show inconsistencies in Mr. Guidry's testimony. Another thing he looked at, for instance, was he looked at the surveillance video where Mr. Guidry was found mowing his lawn. Mr. Guidry didn't deny he mowed his lawn. In fact, Dr. Modowney said he would have told him to mow his lawn to stay active. Dr. Modowney said that if he's using one of these pull lawn mowers, you know, that self-propelled, thank you, that that would be very reasonable because it's the equivalent of basically leaning on something and being pulled along. In addition to that, you also have the fact that the judge also disagreed and found lack of credibility in Ms. Carey, who is the fiancee. And he found a lack of credibility for a variety of reasons, including reasons such as she didn't know his full medical history. I don't know that that's actually anything that can be relied on. She had just moved in with him several years before. She didn't, I don't think anyone would expect you to know everything about the person you just moved in with. But in addition to that, she did testify about the lawn mower incident. She did testify that he was not mowing the grass since his injury. She did testify that they had specifically bought the self-powered lawn mower so that it would be easier for him to cut the grass, or her if she had to do it, and that she was cutting the bulk of the grass. You have Dr. Modowney saying that it's not a problem, yet the judge found that this is somehow a lack of credibility on the part of the claimant. I think that when you say what legal error, for want of a better term, I don't think the judge is entitled, or any trial fact, to cherry pick out certain things and ignore the rest of the context that they fall in. And I think if you look at the context of the entire case, and all of the evidence that was presented, and how the contradictions that the judge says he sees, or inconsistencies aren't in fact inconsistent, that the judge simply chose some facts to base his opinion on that aren't necessarily completely correct. Based on that, he then used that finding to throw out the testimony of the lay witness, Ms. Carey, who confirmed that Mr. Guidry had been hurt, who confirmed that Mr. Guidry had changed in his demeanor, who confirmed that Mr. Guidry was no longer able to do a lot of things that he had done before, and you also, it allows the judge to then throw out the findings of the respondent's doctor, Dr. Bonker, who's the first doctor of these doctors to see him, as well as the claimant's doctor. And so then he can ignore those, and say he believes that the best evidence on which to base this whole case is the objective evidence in the MRIs. Yet this lies in the face of the testimony by Dr. Romero, the other employer's physician, who says that you don't just look at radiology, you look at radiology compared with other things from the examination, and he went on to say in his testimony that the man may have had an exacerbation, the man may have been newly injured, the man needed physical therapy before he could go back to work, the man was not yet at MMI, and the man probably would not go back to that type of job, go back to medium job, which is not where he was at before. All of these things arise under the aggravation rule, to get back to what you were saying, Judge Duncan, arise to the level of saying even if it wasn't a new injury, the facts of the case show that there was an aggravation of an underlying injury that now precluded him from continuing to work. Are you saying that, just so I understand, what was Dr. Romero's ultimate opinion? Dr. Romero's ultimate opinion was that he needed to get physical therapy, he was not at MMI, but that he would probably be able to do a medium level job. Yes, but with respect to was this an aggravation caused by the incident, or was it a continuation of ongoing symptoms? I believe that his answer was that it was a possible exacerbation. Now, a possible exacerbation is equivocal in the jurisprudence for long-short cases. Normally that testimony might actually be thrown out because it's equivocal. Based on all of the different issues that we have with the testimony of the different doctors, I think the bottom line that we need to consider, or that we ask the court to consider, is that you have four doctors that the judge talked about. He didn't talk about the VA doctors very much, but the VA doctors are still treating him. He didn't talk about Dr. Bereni, but Dr. Bereni is treating him on behalf of the VA, or was treating him on behalf of the VA. You have Dr. Romero. I'm sorry, my time is up. Thank you, sir. Mr. Salone? May it please the court. This case went to trial before Judge Rosenau in December of 2019. Judge Rosenau is the chief judge of the Covington District Office of Administrative Law Judges in Covington. There were multiple live witnesses at the trial. There were over 1,000 pages of documents, many of which were documents from the New Orleans VA Center and the Alexander VA Center that established a long history of low back and left leg problems that the claimant has had for at least five years before this incident. After the trial, Judge Rosenau called for a post-trial briefs. He issued a 32-page decision order, of which the first 27 pages were findings of facts based upon the trial record and his opinion about the credibility of the witnesses, the  trial. He invoked the Section 28 presumption for the claimant. He found that we rebutted the 28 presumption. He removed the presumption from the case. He considered the totality of the evidence in the case, and he found that the claimant did not prove that his work on March 13, 2015, had anything to do with his longstanding complaints of low back and left leg pain. I think one of the major arguments made by Mr. Swallow is that the ALJ appeared to prefer Dr. Kagan's testimony, and Dr. Kagan was simply looking at MRIs, and privileged that over the testimony of treating physicians, and that that shows an error. What is your response to that? My response to that is that that was the base of the 28 presumption, that we had an obligation to rebut. Sure, but as I understand it, the ALJ said it's been rebutted, and looking primarily to Dr. Kagan? Is that right? He found, Judge Rosenau found at page 27 of his opinion, that the trial record contained extensive evidence of the claimant reporting significant pre-existing cervical and lumbar problems. Then he went to the report and findings of Dr. Kagan, which is our Exhibit 34. Dr. Kagan graduated from Georgetown Medical Center, he's board certified in radiology, he is professor of radiology at the University of Miami Medical Center for years. Dr. Kagan found and rendered 14 pages of opinion. The first was, is that the MRI performed at the Alexandria VA, six months before this incident reflected that the claimant had herniated disc at the L4, L5 level, and L5S1 levels, two different levels. He found that there was stenosis at both of those levels, and he found that there was nerve root compression on the disc at both of those levels. That was based on an MRI which was performed six months before the incident. Then he looked at the incident of the MRI that was performed in Tampa, three days after the incident, it was March 15, 2015. He compared that MRI three days after the incident to the MRI six months before. He said actually there was improvement on both levels of those discs in the MRI that was performed three days after the incident than it was from the MRI that was performed six months before the incident. So as I understand it, that would count against Mr. Guidry? I'm sorry? That would count against Mr. Guidry, right? That opinion by Dr. Kagan? That opinion of Dr. Kagan. Not an aggravation caused by the incident, but instead a pre-existing problem. That's right. He said, that's right, that the findings on the MRI three days after the incident were the same as the findings that were six months before the incident on that MRI, except there was actually improvement. What about Dr. Romero? Dr. Romero, we had the claimant evaluated by Dr. Romero. Dr. Romero is fellowship trained in spinal surgery from Stanford. Dr. Romero said he compared both of the MRIs, the pre-incident MRI and the MRI three days later. He said the MRI three days later was really improved over the pre-incident MRI six months before. He found, he testified, we have his deposition and evidence, he found no objective evidence of any injury to this claimant, either cervical or lumbar. His findings were consistent with, his findings and his complaints were perfectly consistent with the repeated complaints that he had to the VA medical centers in the preceding five years before this incident. Dr. Romero said he found no objective evidence of any injury, either in the back or the neck to this claimant. Now, who are the other doctors? The other doctor is the claimant's one-time doctor named Muldowney. Dr. Muldowney saw the claimant as well. He didn't, the claimant said to both our doctor, Dr. Romero, that he was asymptomatic before this incident, for four years before this incident. We sent Dr. Romero the previous records of the VA medical centers in New Orleans and we sent them to Dr. Muldowney. Dr. Muldowney said the claimant told him he was pain-free four years before the accident. He didn't have the benefit of these VA medical records before. So is that what the ALJ relied on in sort of discounting the testimony of Dr. Muldowney? That's correct. That's one of the reasons, Your Honor, that he didn't have the benefit of this long history of prior low back and leg complaints. That's why. Now, it's interesting. A claimant relies a great deal on a doctor named Dr. Boner. Dr. Boner is an occupational health doctor in Tampa. The medical records from the Tampa VA after this incident, which occurred on a Friday, the incident occurred on a Friday. The claimant showed up at the Tampa VA on Monday. They gave him an MRI on that Monday. The MRI, well, that's right, three days later, it's the same MRI that Dr. Kagan said was improved over the MRI he had six months before. The claimant was hospital overnight and in those records, the VA indicated that the claimant just four days before this incident had filled a prescription for 120 hydrocodone tablets that he was taking and had been taking for years, and he filled that prescription just four days before this incident happened. Claimant's position is he was completely asymptomatic before this incident for a period of four years. The VA records before this incident don't indicate that. Even the VA records in Tampa establish that just four days before this, he was on painkillers. So he was very much symptomatic. One thing, one thing, counsel, I'm sorry. Dr. Romero, he said that it was possible that claimant could have exacerbated his underlying degenerative condition when scaffolding fell. That's correct, Your Honor. Based upon the fact, he said it's possible that happened, but he reviewed the VA medical records that preexisted this incident, and he said based upon those VA medical records, it's his opinion that the claimant's complaints of low back and left leg pain were simply a continuation of his long history of back and leg problems. And this is true for the L4 and 5 and L5S1 and the C5, C6 and C5, C6 and 7? That's true for all of it? I'm sorry. I used to do this kind of back stuff. I'm sorry, Your Honor. I have no hearing loss. I'm trying to, I'm asking. It's true for all of the vertebrae at issue? Well. That's because I'm trying to figure out if it's true for the C5 to 6 and the 6 to 7. Is it true for that, or is that different? Because the other's lumbar and S1 with spondylosis, but this is not. So I'm trying to figure out if there's a difference there. Thank you, Judge. Dr. Kagan, the radiologist, wrote a multi-page report on the low back, and we've discussed that, and thank you for bringing that up. He also wrote a multi-page report on the cervical findings, and he said the cervical findings that he reviewed within the month or two after this incident were similar to degenerative disc disease at the C5, 6, C6 levels. No evidence whatsoever of a new disc injury. No evidence whatsoever of a disc herniation. So the neck is all degenerative? All degenerative, entirely degenerative, is what his opinion was. And going back, it's interesting, going back to the neck, we've talked about the back. When the claimant saw Dr. Boner in Tampa after this incident, I think it was March 24th, nine days after the incident, that's after the claimant had been released from the Tampa VA Hospital on March 20th with findings from the doctor at that point that he was malingering, that the doctor personally observed the claimant sit up in his hospital bed with no sign of pain or discomfort. He saw him walk down the hall of the hospital without any problem, and then he went back and he looked at how much painkillers the claimant had received from the VA medical centers, and the opinion of that VA doctor on March 20th, he was malingering. Of course, the claimant didn't say anything to Dr. Boner five days later. The claimant in his brief wrote that the reason Dr. Boner said the claimant had not told him anything about this prior back and neck problems is because Dr. Boner did not ask him. Well, Dr. Boner's records and evidence, as is his deposition, and you will see at page, Exhibit 65, page 29, Dr. Boner had the claimant filled out a medical questionnaire, as all occupational medical doctors do, before they see him, and the question was to the claimant filled out in his handwriting, the reason he was seeing Dr. Boner and the claimant answered in his handwriting is that he hurt his back and left leg on March 13, 2015, that's the incident day. Then the claimant answered this question by Dr. Boner, they asked, have you been treated for this problem before, and if so, when and where, and the claimant in his handwriting wrote his only statement was March 16, 2015, at the VA. Nothing was said about this long history of left leg and back problems that he had received. Nothing was said to Dr. Boner about any pre-existing back or leg problem. It was much made of Dr. Boner in the brief that claimant's counsel filed about the reason the claimant didn't tell him about this is he didn't ask what he did ask, and the claimant simply didn't tell him. So, and another thing that's important, Dr. Boner testified that the claimant never mentioned anything about a neck problem, never complained about a neck problem, Dr. Boner evaluated his neck on both occasions that he saw him, his neck was entirely normal and he had no complaints of a neck injury. His only complaint to Dr. Boner was a low back injury and a left leg injury. Can you comment on this cocaine arrest that's about some other person with that name and whether that could have influenced? Yes, I saw that mentioned. That same argument was made to the Benefits Review Board. In the 27 pages that Judge Rosenau recited the facts that was based on the trial record, there was three lines about the findings that was in the home of newspaper about a person with the same name as the claimant that was arrested and convicted of cocaine. We withdrew that exhibit and Judge Rosenau never relied on anything having to do with that newspaper article in his findings and conclusions in this case. So he did not say it was of marginal benefit to him in his decision making? Marginal relevance or something, did he not say that? I don't recall that he did, Your Honor. I think once the presumption fell out of the case, Section 28 presumption of causation, then Judge Rosenau considered the entirety of the evidence and found that the claimant had simply failed to meet his burden of proof in this case. The claimant appealed to the Benefits Review Board on the same grounds that he has appealed to this court. The Benefits Review Board on every ground that Judge Rosenau based his decision in this case, the Benefits Review Board unanimously affirmed Judge Rosenau. We would submit that the record is clear that Judge Rosenau was in the correct in his findings and conclusions in this case. He's entitled to deferential consideration with regard to his factual findings and with regard to his credibility findings. We believe he was eminently correct in how he found in this case that the Benefits Review Board agreed with those conclusions. If there's no more questions, I'll yield my time back to the Court. Thank you, Mr. Moore. Thank you. Mr. Spaulding, you have six minutes on the button. Thank you, Your Honor. Your Honor, Judge Everett, you talked a little bit about the neck and how the neck was different from the low back and how the neck findings were different. Dr. Kagan did not see a prior MRI of the neck because there was one. The neck MRI occurred after this accident. There was only one. So all he could say at that point is, based on his opinion in looking at the film only, that it had to all be preexisting degenerative, okay? He never talked to the man. He didn't correlate it with physical findings as Dr. Modany did, as Dr. Bonker did. In addition to that, he can't discuss, Dr. Kagan can't discuss whether or not the man had to have preexisting pain. This is a red herring that the employer continually threw up throughout the trial, that he had to have preexisting pain and therefore none of this overcame that preexisting pain. That's not the way the aggravation rule works. You don't look at the aggravation based on whether or not there's something totally new as if the man was 100% well before he started. He comes in and the employer takes him as they find him, okay? So he comes in, he's got preexisting conditions. And the way the law is written is, if during the course and scope and arising out of the employment, something happens that changes those conditions. And Dr. Modany pointed out that a change in symptoms is a change in conditions. In here, we had a scaffold that was being lifted. It was too heavy for the crew to lift. He fell. There was a change in conditions. It's an actual accident that occurs. He can point to the accident and he can point to getting treatment thereafter. Monday, he was admitted into the hospital, the VA, okay? So he can show that there was a change in circumstances. He testified repeatedly about his increased pain. Even the VA in Alexandria, they make a big deal, Rafaun makes a big deal about, oh, he was getting all this medication prior. He was getting all this treatment prior. If you look at those records, and in our post-trial brief, we had an attachment one, which lists out all of the medications that he got from the VA. And if you look at those medications, you'll see that the bulk of it is for other things, teeth, stomach, elbow, all kinds of conditions. Very few were for back. Very few were specifically for back. But assuming that he was getting the medication for back, he claims that the condition he was being treated for by the VA, the chronic condition, was pain in his hip. Now, if you assume the hip and the back are connected, all right, and that that's actually his layman misunderstanding of it, fine. But then you have to also assume that whatever the medication he was receiving prior to this injury, after the injury, when he went back to the VA facility in Louisiana, in Alexandria, he received an increased dose of that medication. Again, which infers, implies, that his pain has increased. This is objective from the doctors. They wouldn't just give out more medicine if they didn't think he was actually having additional pain, if they didn't see something on the film to help them make that decision. If they didn't see a new film for his neck, that showed now conditions that he's complaining about. And he wants to say, oh, well, when he saw Dr. Bonker, he didn't complain about his neck. He got admitted to the hospital in Florida right after the accident, the VA hospital there, because he had pain in his low back. By the time he got back, that was in March, the end of March, he left, because Dr. Bonker wouldn't let him go back to the shipyard, said, go home, get a surgeon. He went back at the end of March to Louisiana, went to the VA in Alexandria, and had a CT scan of his neck in May. Now, anyone who's a veteran, I am, knows that you can't go to the VA and get a lung. You're free to bring your clothes, extend your time. You may finish yourselves. Thank you, Your Honor. You can't get that type of treatment that quick unless there's an issue. Thank you. I appreciate your time. Thank you, sir.